IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

KAULMAN REESE VINES,
      Petitioner,

vs.                                 Case No.:  3:14cv191/LAC/EMT

JULIE L. JONES,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (doc. 1).  Respondent filed an answer and relevant portions of the state court record (docs. 20, 21).  Petitioner filed a reply (doc. 26).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* doc. 21).[1]  Petitioner was indicted in the Circuit Court in and for Escambia County, Florida, Case No. 2007-CF-4430, on one count of first degree murder with a weapon (Ex. A).

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (doc. 21).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

Following a jury trial on June 15, 16, and 17, 2009, he was found guilty as charged (Ex. J at 774; Ex. O).  On June 17, 2009, Petitioner was sentenced to life imprisonment, with pre-sentence jail credit of 655 days (Ex. P).  Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D09-5119 (Ex. R).  The First DCA affirmed the judgment per curiam without written opinion on February 8, 2011, with the mandate issuing February 24, 2011 (Ex. T).  Vines v. State, 53 So. 3d 1032 (Fla. 1st DCA 2011) (Table).  Petitioner did not seek further review.

On April 21, 2011, Petitioner filed a motion for reduction or modification of sentence, pursuant to Rule 3.800(c) of the Florida Rules of Criminal Procedure (Ex. U).  The state circuit court summarily denied the motion in an ordered rendered April 28, 2011 (id.).

On July 18, 2011, Petitioner filed a motion to correct sentence, pursuant to Rule 3.800(a) of the Florida Rules of Criminal Procedure (Ex. V).  In an order rendered July 29, 2011, the state circuit court construed the motion as a motion for post-conviction relief under Rule 3.850 of the Florida Rules of Criminal Procedure, and summarily denied Petitioner's claims as procedurally barred (Ex. W).

On August 8, 2011, Petitioner filed a Rule 3.850 motion (Ex. X).  In an order rendered August 26, 2011, the state circuit court struck the motion as facially insufficient, without prejudice to Petitioner's filing an amended motion "within a reasonable time" (Ex. Y).  Petitioner filed, through counsel, an amended motion on August 31, 2012 (Ex. BB).  The state circuit court summarily denied it on January 31, 2013 (Ex. CC).  Petitioner appealed the decision to the First DCA, Case No. 1D13-1384 (Exs. DD, EE).  The First DCA affirmed the decision per curiam without written opinion on July 23, 2013, with the mandate issuing August 8, 2013 (Ex. GG).  Vines v. State, 117 So. 3d 414 (Fla. 1st DCA 2013) (Table).

On September 30, 2013, Petitioner filed a petition for writ of habeas corpus in the First DCA, Case No. 1D13-4733, alleging ineffective assistance of appellate counsel (Ex. HH).  The First DCA denied the petition as untimely on October 18, 2013, and denied Petitioner's motion for rehearing on February 14, 2014 (Exs. II, JJ).  Vines v. State, 131 So. 3d 800 (Fla. 1st DCA 2013) (Mem).

On May 19, 2014, Petitioner filed another petition for writ of habeas corpus in the First DCA, Case No. 1D14-2290, alleging ineffective assistance of appellate counsel (Ex. KK).  The First

DCA again denied the petition as untimely on June 12, 2014, and denied Petitioner's motion for rehearing on July 23, 2014 (Exs. LL, MM).  Vines v. State, 141 So. 3d 1228 (Fla. 1st DCA 2014) (Mem).

Petitioner filed the instant federal habeas action on April 14, 2014 (doc. 1).

II.     STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19. In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> > (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to

---

[2] Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  Neeley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'"  Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06).  If the State court decision is found in either respect to be contrary, the district court

must independently consider the merits of the petitioner's claim.  Moreover, where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law.  *See* Henderson v. Campbell, 353 F.3d 880, 890 n.15 (11th Cir. 2003).

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  Williams, 529 U.S. at 409.  Whether a State court's decision was an unreasonable application of a legal principle must be assessed in light of the record the court had before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam); *cf.* Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context."  Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).  "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.'"  Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, 562 U.S. 86, 103, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).  The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.  *See* Gill, *supra* at 1291 (citing Richter).  Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court.  *See* Richter, 562 U.S. at 102; *see also* Gill, *supra*, at 1292

(the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); see e.g., Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").  The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding.  See Gill, 633 F.3d at 1292.  A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. Id.

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims.  See Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 168 L. Ed. 2d

662 (2007); <u>Jones</u>, 469 F.3d 1216 (same).  The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

III.   EXHAUSTION AND PROCEDURAL DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, *see* 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights."  <u>Duncan v. Henry</u>, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim.  <u>Duncan</u>, 513 U.S. at 365–66; <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); <u>Picard</u>, 404 U.S. at 277–78.

The Supreme Court has provided lower courts with guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In <u>Picard v. Connor</u>, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief.  404 U.S. at 277.  In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," *id.*, 404 U.S. at 278, the Court rejected the contention in that case that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is not enough that a petitioner make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court.  <u>Anderson v. Harless</u>, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982).  In <u>Anderson</u>, the habeas petitioner was granted relief by the Sixth Circuit Court of Appeals on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt.  459 U.S. at 7 (citing <u>Sandstrom v. Montana</u>, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)).  The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which

"the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." Anderson, 459 U.S. at 7.  The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim. *Id.*, 459 U.S. at 7 and n.3.  Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought.  *Id.*

Years later, the Supreme Court readdressed the "fair presentation" requirement in Duncan v. Henry, 513 U.S. 364.  The Duncan Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[3]  The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court." Duncan, 513 U.S. at 365–66.  More recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." Baldwin v. Reese, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004). In Baldwin, the Supreme Court recognized that "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Id.*, 541 U.S. at 32.  This language, while not part of the Court's holding, provides helpful instruction.  With regard to this language, the Eleventh Circuit explained in McNair v. Campbell, 416 F.3d 1291 (11th Cir. 2005):

---

[3] The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.  513 U.S. at 366.

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion. However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'" McNair [v. Campbell], 315 F. Supp. 2d at 1184 (quoting Vasquez v. Hillery, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)). This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302-03 (citations omitted).[4]

The Eleventh Circuit, prior to Duncan, had broadly interpreted the "fair presentation" requirement. After Duncan, however, the Eleventh Circuit has taken a more narrow approach. For example, in Zeigler v. Crosby, the court held that the habeas petitioner failed to "fairly present" his juror misconduct claims to the state courts where his brief to the state appellate court did not refer to the federal constitutional issues raised in his federal habeas petition, and none of the cases cited in his direct appeal discussed the United States Constitution. 345 F.3d 1300, 1307 (11th Cir. 2003). The Eleventh Circuit specifically noted that the section of the petitioner's appellate brief which dealt with juror misconduct contained the words: "Appellant was denied due process and a fair trial. . . .," which could be interpreted as asserting a fair trial claim under the Due Process Clause of the Florida Constitution. Id. at 1308 n.5. The only cases cited in the discussion of the issue in petitioner's state appellate brief were state supreme court cases that made no mention of the United States Constitution and cited no federal cases. The court concluded that petitioner's "[c]ursory and conclusional sentence (unaccompanied by citations to federal law), . . . did not present to the Florida courts the federal claim asserted to us." Id.

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, that is, procedurally

---

[4] In his initial brief before the Court of Criminal Appeals, McNair cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005). The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. Id.

barred from federal review.  *See* O'Sullivan, 526 U.S. at 839–40, 848; Bailey v. Nagle, 172 F.3d 1299, 1302–03 (11th Cir. 1999).  This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default.  *See* Coleman v. Thompson, 501 U.S. 722, 734–35 and n.1, 111 S. Ct. 2546, 2555 and n.1, 115 L. Ed. 2d 640 (1991); Caniff v. Moore, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); Chambers v. Thompson, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991).  In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. Bailey, 172 F.3d at 1303.  In the second instance, a federal court must determine whether the state's procedural default ruling rested on adequate state grounds independent of the federal question.  *See* Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989).  The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question.  Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002).  The adequacy requirement has been interpreted to mean that the rule must be "firmly established and regularly followed," Siebert v. Allen, 455 F.3d 1269, 1271 (11th Cir. 2006), that is, not applied in an "arbitrary or unprecedented fashion," Judd v. Haley, 250 F.3d 1308,1313 (11th Cir. 2001), or in a manifestly unfair manner.  Ford v. Georgia, 498 U.S. 411, 424–25, 111 S. Ct. 850, 858, 112 L. Ed. 2d 935 (1991); Upshaw v. Singletary, 70 F.3d 576, 579 (11th Cir. 1995).

The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision.  Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001).  First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[5]  Second, the state

---

[5] The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits.  Marek v. Singletary, 62 F.3d 1295, 1302 (11th Cir. 1995); Alderman v. Zant, 22 F.3d 1541, 1549 (11th Cir. 1994).

court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. Third, the state procedural rule must be adequate. *Id.* The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion. *Id.*

To overcome a procedural default such that the federal habeas court may consider the merits of a claim, the petitioner must show cause for the default and prejudice resulting therefrom or a fundamental miscarriage of justice. Tower, 7 F.3d at 210; Parker, 876 F.2d 1470. "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)). To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." Schlup, 513 U.S. at 327. Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

*Id.* Although a habeas petitioner asserting a convincing claim of actual innocence need not prove diligence to overcome a procedural bar, timing is a factor relevant in evaluating the reliability of a petitioner's proof of innocence. *See* McQuiggin v. Perkins, — U.S. —, 133 S. Ct. 1924, 1935, 185 L. Ed. 2d 1019 (2013). As the Court stated in Schlup, "[a] court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reliability of . . . evidence [of actual innocence]." 513 U.S. at 332; *see also* House, 547 U.S. at 537.

IV.   CLEARLY ESTABLISHED FEDERAL LAW APPLICABLE TO CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984). To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 687–88. If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688–89. "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15). Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "outside the wide range of professional competence." Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation"). "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting Putman v. Head, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the <u>Strickland</u> standard, Petitioner's burden of demonstrating prejudice is high.  <i>See</i> <u>Wellington v. Moore</u>, 314 F.3d 1256, 1260 (11th Cir. 2002).  The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'"  <i>Id.</i> (quoting <u>Strickland</u>, 466 U.S. at 693).  However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome.  <u>Strickland</u>, 466 U.S. at 693–94.  Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

<i>Id.</i> at 694.  Indeed, it would be "contrary to" the law clearly established in <u>Strickland</u> for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence.  <u>Williams v. Taylor</u>, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. <u>Strickland</u>, 466 U.S. at 694–95.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  <i>Id.</i> at 695.  Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), <u>Strickland</u> prejudice is gauged against the outcome of the trial, not on appeal.  <i>See</i> <u>Purvis v. Crosby</u>, 451 F.3d 734, 739 (11th Cir. 2006) (citing <u>Strickland</u>, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  <u>Strickland</u>, 466 U.S. at 698; <u>Collier v. Turpin</u>, 177 F.3d 1184, 1197 (11th Cir. 1999).

V.    PETITIONER'S CLAIMS

    A.    <u>Ground One, sub-claim (1):  "Defense counsel rendered ineffective assistance of counsel when he caused the introduction of previously suppressed evidence to be submitted to the jury by failing to adequately prepare Petitioner for his examination, opening the door</u>

to prejudicial testimony that was otherwise inadmissible and failing to seek a judicial
determination that the recorded statements were voluntary."

Petitioner claims that his trial counsel failed to properly prepare himself and Petitioner for
trial in order to ensure that neither counsel nor Petitioner "opened the door" to the State's admission
of his statements to law enforcement, some of which were the subject of a successful motion to
suppress by counsel (doc. 1 at 10–16).[6]  Petitioner also appears to argue that trial counsel was
ineffective for failing to object to use of the statements, on the ground that they were involuntary.

Petitioner asserts that trial counsel "opened the door" to the State's use of the suppressed
statements by asking Petitioner, during direct examination, about statements he made to law
enforcement when they arrived at the scene (doc 1. at 13).  Petitioner asserts that the prosecutor then
used the suppressed statements during his cross-examination of Petitioner as follows:

Q.     Well did you tell them [law enforcement officers] that you killed him
because he was starting to be a sorry bastard?

A.     No, but I did tell them he was a sorry bastard.

Q.     Did you tell the police at least three times, I'm fixing to get the
electric chair for this?

A.     I might have mentioned it out in the car joking.

Q.     Joking?

A.     Yeah.

(see doc. 1 at 11 (quoting trial transcript, Ex. J at 478–80)).

Petitioner asserts that the State was then able to present rebuttal testimony of Deputy
Sterling,  that Petitioner stated several times in the patrol car that he was going to receive a death
sentence, and that the victim was a "sorry bastard" and deserved to be killed (see doc. 1 at 11–12).
Petitioner asserts that during defense counsel's cross-examination of Deputy Sterling on rebuttal,
counsel questioned Sterling extensively about Petitioner's statements in the patrol car, and used a

---

[6] Petitioner made statements to law enforcement officers prior to his being placed in a patrol car and while he
was in the patrol car.  Only his statements in the patrol car were the subject of the motion to suppress and the trial court's
suppression order.

transcript of the interrogation to do so (*id.* at 12).  As a result, the prosecutor was able to have Deputy Sterling read extensively from the transcript on re-direct (*id.*).

Petitioner contends that as a result of trial counsel's ineffectiveness, the jury was permitted to hear his prejudicial statements in the patrol car, and the prosecutor was able to argue during closing arguments that Petitioner's statements suggested his consciousness of guilt and discredited his testimony and theory of self-defense (doc. 1 at 12–13).  Petitioner alleges the jury would not have heard the statements if defense counsel had prepared him "to truthfully and effectively testify," and if counsel had not elicited testimony that "opened the door" to admission of the statements (*id.*)  Petitioner contends there is a reasonable probability that the outcome of his trial would have been different but for counsel's alleged error (*id.*).

Respondent states that it appears Petitioner satisfied the exhaustion requirement (doc. 20 at 27 n. 13).  Respondent contends Petitioner failed to demonstrate that the state court's adjudication of this ineffective assistance of trial counsel ("IATC") claim was based upon an unreasonable determination of the facts, or was contrary to or an unreasonable application of clearly established federal law (*id.* at 21–33).

The state court record demonstrates that Petitioner raised this IATC claim as Claim I in his amended Rule 3.850 motion (Ex. BB at 35–48).  The state circuit court applied the following legal standard to Petitioner's IATC claims:

> Two requirements must be satisfied for ineffective assistance of counsel claims to be successful under the Strickland standard:  1) a defendant must show that counsel's actions or omissions were deficient; and 2) the deficiency established must further be shown to have so affected the proceeding that confidence in the outcome is undermined.  See Johnston v. State, 70 So. 3d 472, 477–478 (Fla. 2011) (construing Strickland v. Washington, 466 U. S. 668 (1984)).  To prove counsel's performance was deficient, a defendant must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." Strickland, 466 U. S. at 690.  A reviewing court must then, in light of all the circumstances, determine whether "the identified acts or omissions were outside the wide range of professionally competent assistance." Id.  However, a Court must strongly presume that counsel's actions were reasonable at the time of the conduct. Id. at 689.
>
> Next, to establish prejudice, a defendant must demonstrate that because of counsel's deficient performance, he was deprived of a fair trial with a reliable result.

The prejudice requirement is satisfied only if there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U. S. at 694. Mere speculation that counsel's error affected the outcome of the proceeding is insufficient. Id. at 693.

(Ex. CC at 60–61).  The court adjudicated Claim I as follows:

> **"Claim I:"  trial counsel failed to properly prepare Defendant to testify, which caused Defendant to "open the door" for previously-suppressed statements to be admitted into evidence.**
>
> As Defendant explains in the instant motion:  "The trial court granted the Defendant's motion and suppressed the recorded statements made to the deputies on September 2, 2007, while in custody, seated in an ECSO cruiser and questioned by deputies following the defective advisement of Miranda warnings."[FN 3] Defendant claims that counsel inadequately prepared Defendant to testify, which led to Defendant "opening the door" for the previously-suppressed statements to be admitted.
>
> > [FN 3:  See Attachment 3, Defendant's "Motion to Suppress Statements [and] Incorporated Memorandum of Law"; "State's Response to Defendant's Motion to Suppress"; and "Order Granting Motion to Suppress Statements."]
>
> Essentially the previously-suppressed statements were brought up as follows:
>
> STATE:[FN 4]  Well, did you tell them that you killed him because he was starting to be a sorry bastard?
>
> DEFENDANT:  No, but I did tell them he was a sorry bastard.
> ***
> STATE:  Did you tell the police at least three times, I'm fixing to get the electric chair for this?
>
> DEFENDANT:  I might have mentioned it out in the car joking.
>
> Q:  Joking?
>
> A:  Yeah.
> ***
> WITNESS:[FN 5]  He told me he was going to get the fucking electric chair and that he was going to get the death sentence.

STATE:  He said that more than once?

A:  Several, yes.

Q:  What else did he say about Mr. Russell, in terms of his having killed him, whether or not he deserved it or anything?

A:  Yes, he said the sorry bastard deserved it, I killed him.  He said, I put him in a tarp in the backyard.

[FN 4:  See Attachment 4, trial transcript excerpts, cross-examination of Defendant, pp. 478–480.]

[FN  5:    See  Attachment 4,  trial  transcript  excerpts,  redirect examination of Deputy Melissa Sterling, p. 635.]

Ultimately a transcript of the previously-suppressed statement was read for the jury.[ FN 6]

[FN 6:  See Attachment 4, trial transcript excerpts, pp. 669–671.]

Subsequently, defense counsel questioned Deputy Sterling regarding these statements.[FN 7]  Counsel also addressed the statements in his opening statement, which he reserved until the close of the State's case.  At that time, defense counsel highlighted the fact that Defendant had a 0.4 blood alcohol level, that Defendant was "susceptible to suggestive questioning;" emotional, and upset.[FN 8]

[FN 7:  See Attachment 4, trial transcript excerpts, pp. 661–662.]

[FN 8:  See  Attachment 4,  trial  transcript  excerpts, p. 355.  The statements  were  also  discussed  in  closing  arguments,  see pp.683–738.]

Defendant cannot prevail on this claim because he cannot prove that he was prejudiced by the admission of the previously-suppressed statements.  The evidence in this case was overwhelming, in fact, Defendant conceded that he killed the victim, his roommate.[FN 9]  When the police arrived at the house shared by Defendant and the victim, they saw large amounts of blood and brain matter on the floors and a clean-up in process.[FN 10] Additionally, $7300.00 in cash, which belonged to the victim and was covered in the victim's blood, was found in Defendant's pocket.[FN 11]

[FN 9:  <u>See</u> Attachment 4, trial transcript excerpts, pp. 459–460.]

[FN 10:  <u>See</u> Attachment 4, trial transcript excerpts, pp. 234–235.]

[FN 11:  <u>See</u> Attachment 4, trial transcript excerpts, pp. 222; 297.]

Importantly, Defendant claimed that the killing was done in self-defense. None of the previously-suppressed statements that eventually came into evidence necessarily conflict with a theory of self-defense.[FN 12]  Moreover, Defendant made several other statements that were not suppressed to the police before he was placed in the cruiser car, such as "he's dead," and "I'm screwed."[FN 13]  "The likelihood of a different result must be substantial, not just conceivable." <u>Harrington v. Richter</u>, 131 S. Ct. 770, 792 (2011).  As Defendant cannot prove that he was prejudiced by the previously-suppressed statements coming into evidence, as a result of Defendant allegedly being inadequately prepared to testify.  Defendant is not entitled to relief on this claim.

[FN 12:  The statements could reasonably be interpreted to mean that Defendant felt that his version of events would not be believed, or to reflect distrust in the criminal justice system.  The statements do not directly comment on how the killing happened.]

[FN 13:  <u>See</u> Attachment 4, trial transcript excerpts, pp. 207, 221.]

(Ex. CC at 61–64).  Petitioner argued this issue on appeal to the First DCA (Ex. EE at 6–27).  The First DCA affirmed the lower court's decision without written opinion (Exs. GG).

The state court record shows that Petitioner's trial counsel filed a motion to suppress Petitioner's statements to officers while he was in the police car, on the ground that the warnings given to Petitioner, pursuant to <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), were defective (*see* Ex. B at 25–26).  The State conceded that the motion to suppress should be granted, but only as to statements made by Petitioner as he sat inside the patrol car immediately following the defective <u>Miranda</u> warnings (Ex. C).  The trial court granted the motion, and suppressed Petitioner's recorded statements made to deputies on September 2, 2007, while in

custody, seated in a deputy's cruiser and questioned by deputies following a defective advisement of <u>Miranda</u> warnings (Ex. D).[7]

At Petitioner's trial, the State called Brian Ruppert, a deputy with the Escambia County Sheriff's Office ("ECSO"), as its first witness.  Ruppert testified that he responded to Petitioner's house on September 1, 2007, in response to Petitioner's call to 911 (Ex. J at 163–78).  Deputy Ruppert testified that Petitioner complained that his roommate, Mr. Russell, smoked marijuana. Ruppert testified that Petitioner led him to Mr. Russell's room, and Ruppert observed that the door had been previously closed and locked with a hasp, but the hasp had been broken and the door pried open with a pry bar that was lying on the floor near the door.  Petitioner admitted to Deputy Ruppert that he pried the door open.  Deputy Ruppert testified that it was obvious to him that Mr. Russell and Petitioner lived in separate quarters, so he told Petitioner that he would not search Mr. Russell's room for marijuana without his consent.  Deputy Ruppert testified that about that time, Mr. Russell arrived at the house in a van.  Deputy Ruppert and Petitioner went outside, and the three men talked. Petitioner did not express any fear of Mr. Russell, nor did he indicate that Mr. Russell had guns in his room or had threatened him.  Deputy Ruppert testified that Mr. Russell showed him a money clip with "a fair amount" of bills in it.  Deputy Ruppert explained to Petitioner that he was lucky that Mr. Russell did not wish to pursue burglary charges against him.

Deputy Ruppert testified that he again responded to Petitioner's house the next day, on September 2, 2007 (Ex. J at 163–78).  He testified that Deputy Sterling approached him when he arrived, and provided information she had gathered prior to Ruppert's arrival.  Deputy Ruppert testified he asked Petitioner where Mr. Russell was, and Petitioner responded, "He's gone." Ruppert testified that at one point, Petitioner stated that Mr. Russell had gone to the store, so Ruppert pointed out that Mr. Russell's van was still at the house.  Deputy Ruppert testified he observed a little bit of blood on the floor and some eyeglasses.  He testified he took a couple of steps toward Mr.

---

[7] The trial court granted the motion to suppress based upon defense counsel's argument, and the State's concession, that the <u>Miranda</u> warnings given to Petitioner were identical to those that the Florida Supreme Court declared defective in <u>State v. Powell</u>, 998 So. 2d 531 (Fla. 2008) (*see* Ex. B at 25–26).  After Petitioner's trial and while his direct appeal was pending, the United States Supreme Court overturned the Florida Supreme Court's decision, holding that the form of <u>Miranda</u> warnings given by the officers to the suspect, reasonably conveyed the information required by <u>Miranda</u> to the suspect.  *See* <u>Florida v. Powell</u>, 559 U.S. 50, 130 S. Ct. 1195, 175 L. Ed. 2d 1009 (2010).

Russell's room and saw that there was a shower curtain in the doorway, which had not been there the previous day.  He testified he looked down and saw a little bit of blood, and then pushed the door open, and he saw a lot of blood.  He testified he immediately grabbed Petitioner and took him outside.  He testified Petitioner stated several times, "I'm screwed," "Oh shit," and "I'm done." Deputy Ruppert testified that he searched Petitioner and found a money clip containing money in his pocket, which appeared to be the same money clip and money that Mr. Russell pulled from his pocket the previous day.  He testified that he and Deputy Sterling placed Petitioner in a patrol car, and he (Ruppert) went back into the house.  Deputy Ruppert testified that he returned to Mr. Russell's room and observed a pool of blood and brain matter.  He testified he observed cleaning supplies and a mop bucket in the bathroom.  He testified he also observed a trail of smeared blood through the living room and kitchen, and out the back door.  He testified that he looked in the back yard and located Mr. Russell's body completely wrapped in a tarp near a small shed.

Deputy Melissa Sterling testified that on September 2, 2007, at approximately 1:00 p.m., she responded to Petitioner's house, with paramedics, after a third party called 911 and reported that two people had been arguing at the house the night before, and one of the persons may have had a medical problem (Ex. J at 215–25).  Sterling testified that Petitioner invited her and the paramedics into the residence.  She testified that she asked Petitioner if he was all right, and she asked Petitioner where his roommate, Mr. Russell, was.  Deputy Sterling testified that Petitioner repeatedly stated "He's gone."   She testified she repeatedly asked him where Mr. Russell was, and Petitioner responded that Mr. Russell was gone, had left, was not there, and, eventually, that Russell had gone to the store.  Deputy Sterling testified that she called for assistance from another deputy, and Deputy Ruppert arrived.  Sterling testified that after asking Petitioner where Mr. Russell was, she and Deputy Ruppert stepped from the livingroom into the hallway and pushed open the door to Mr. Russell's room.  She testified she saw "extreme amounts" of coagulated blood and brain matter.  She testified Petitioner was handcuffed, and as he was handcuffed, he stated he was "screwed."  She testified that as she and Deputy Ruppert were walking Petitioner out of the house, Petitioner stated, "He's dead.  He's dead." Deputy Sterling testified that when she searched Petitioner, she discovered a large quantity of $100 bills with blood on it, in addition to the money discovered by Deputy

Ruppert.  She testified that she read Petitioner his <u>Miranda</u> rights, and he began to talk.  She testified that Petitioner appeared to be intoxicated, and he admitted to drinking, but he was coherent, and she could understand him.  She testified that she went back into the house, and saw a large mop and a yellow bucket with red, bloody water in it in the bathroom.  She testified she also saw blood spots on the bathroom floor.

Shelley Dill, a crime scene technician with the ECSO, testified that upon arriving at the house, she observed blood on the exterior front door of the residence, and upon entering the house, she observed blood on the floor (Ex. J at 232–64).  She testified that upon looking down a hallway, she observed a sheen of dried water mixed with blood on the floor.  She testified there also appeared to be blood on the wall of the hallway.  Dill testified that she observed a large amount of blood and brain matter on the floor of Mr. Russell's room—some of it was in front of the door and some of it was behind the door. She testified that she observed a chair in Mr. Russell's room, with blood, bone matter, seven shotgun pellets, and slivers of wood on the chair.  She observed a piece of skin with hair stuck to a television screen near the chair.  She testified that she observed a hole in the door, consistent with a shotgun blast, that extended all the way through the door.  Dill testified that in the bathroom across from Mr. Russell's room, she observed blood on the floor and a mob and bucket in the bath tub.  She testified that she walked to Petitioner's bedroom and observed two unspent shotgun shell casings on the floor.  She also observed two 12-gauge shotguns under Petitioner's bed, one of which had a live round in it.  She found two $100 bills in the top drawer of Petitioner's dresser, which had blood on them.  Dill testified that she then walked into the kitchen/dining area, and observed "a sheen from possibly mopping up the floor with the blood mixed in" and a shoe impression where someone stepped in blood and then the dried water.  She testified she observed the same smear pattern as she walked to the family room and out the back door.  She testified she saw blood on the brick stairs leading out the back door.  Dill testified that she observed a tarp with Mr. Russell in it.  She testified she observed "severe trauma" to Mr. Russell's head.  She also observed a wound to his right wrist with shotgun wadding in the wound.

Wayne Wright, also a crime scene technician with the ECSO, testified that he found a .38 caliber, loaded revolver in a box in the top drawer of a dresser at the foot of Mr. Russell's bed (Ex. J at 286–89).

Chris Baggett, an investigator with the ECSO, testified that Petitioner had $7,300.00 in cash on his person when he was arrested (Ex. J at 296–97).

Andrea Minyard, the chief medical examiner, testified that she conducted an autopsy on Mr. Russell's body on September 4, 2007 (Ex. J at 305–31).  She testified she observed the following injuries on his body:  (1) a shotgun entrance wound on his right hand and wrist, which was gaping and exposed the bones of his hand, (2) fractured bones in his right hand, (3) a shotgun entrance wound to his forehead, which collapsed his head and exposed the inside of the cranial contents, with little brain matter left in the skull, (4) several shotgun pellet marks scattered across the anterior (front) of his chest, (5) a small bruise on his left arm, (6) red bruises on his right arm, (7) a small, older bruise on his right thigh, and (8) a small bruise on his left thigh.  Dr. Minyard testified that some of the pellet marks indicated that shotgun pellets entered Mr. Russell's right chest area and traveled in a downward direction from the right side of his chest, and stopped in his left thigh.  She testified that this would be consistent with Mr. Russell lying down or reclining with his left knee bent upward and his foot on the ground, but she admitted that this was just her theory and not a conclusive finding about the position of Mr. Russell's body.  Dr. Minyard testified that the shots to Mr. Russell's chest were survivable if he had gone to the hospital in time to stop the bleeding.  She testified that the head wound was fatal.  Dr. Minyard testified that testing of Mr. Russell's blood and urine revealed the presence of heart and blood pressure medications, aspirin, and marijuana.

Petitioner testified in his own defense (Ex. J at 430–67).[8]  Petitioner admitted he had previously been convicted of a felony.  He testified that Mr. Russell moved into the house that he (Petitioner) was renting seven or eight months prior to his death.  Petitioner testified that Mr. Russell owned property in Santa Rosa County, and was upset because he wished to build a building on the property, but the county permitting authority would not issue a permit.  Petitioner testified that Mr. Russell told him that he had been "throwed out" of the permitting office because he cursed at the staff.  He testified that Mr. Russell told him he was going to shoot and kill two of the building

---

[8] The defense also called several other witnesses.  Janice Johnson, trained in the areas of fingerprint analysis, crime scene analysis, and crime scene reconstruction, testified that in her opinion, Mr. Russell was closer to the closet than the desk when he was shot (Ex. J at 356–93).  She also opined that Mr. Russell was in an upright position near the closet when he was shot through his hand and into his chest.  She opined that the evidence was consistent with Mr. Russell then attempting to close the bedroom door and falling to the floor, and that the impact of his attempting to close the door resulted in the second gunshot to his head.  She testified that it was very possible that the door may have affected the discharge of the second shot.

Dr. Michael Berkland provided expert testimony regarding the position of Mr. Russell's body at the time he was shot, and the sequencing of the shots (Ex. J at 536–605).  He opined that Mr. Russell was first shot in the chest while he was standing or nearly vertically standing near the closet.  He opined that Mr. Russell was in a downward position and falling with his head almost on the floor when he was shot in the top of the head.

Kim Camp, a friend of Mr. Russell's sister, testified that after Mr. Russell's death, she accompanied his sister to the house to recover Mr. Russell's belongings (Ex. J at 409–16).  She testified that she found three unloaded guns and a buoy knife in a suitcase in the rear right side of Mr. Russell's closet.

David Gibson, a building inspector in Santa Rosa County, Florida, testified that Mr. Russell came into the inspection office in June of 2007, and became angry over a permitting issue (Ex. J at 486–96).  He testified that Mr. Russell threatened to physically harm him, and he believed that Mr. Russell would follow through with his threat.  He also testified that the women who worked in the office felt threatened by Mr. Russell.  Mr. Gibson testified that on that day in June, he and another inspector escorted Mr. Russell out of the building as quickly as possible.  He testified that during his nine years of experience in the inspection office, people commonly became upset with building inspectors, but no one had become as belligerent, violent, and threatening as Mr. Russell.

Mark Standish testified that Petitioner contacted him about the cost of doing some construction work for Mr. Russell (Ex. J at 500–21).  Standish testified that he visited the site with Mr. Russell, and Russell told him he had a "run-in" with a building inspector, and that if he (Russell) could get the inspector out to the property, he would "take care of him."  Standish testified that he interpreted the comment as meaning that Mr. Russell would kill the inspector.  Mr. Standish testified that Mr. Russell had displayed his firearms to him in his bedroom.  He testified that on one occasion, Standish's dog was barking at Mr. Russell's cat, and Mr. Russell pointed a loaded gun at him (Standish) and said he would kill him and his dog.  Mr. Standish testified that he heard Mr. Russell and Petitioner argue a lot, primarily about Petitioner's wanting Russell to get his drugs and guns out of the house.  Standish testified that Mr. Russell told him that if Petitioner didn't "knock it off," he (Russell) was going to "take care of him."  But Standish did not tell Petitioner about this death threat.  Mr. Standish testified on cross-examination that he also heard Petitioner threaten to "kick [Mr. Russell's] ass."  Standish testified that Petitioner complained about Mr. Russell not paying rent.  He testified that Petitioner also told him that Mr. Russell refused to move out of the house until Petitioner had paid him back for loans.

inspectors.  Petitioner testified that Mr. Russell threatened to shoot him if he tried to take any of his (Russell's) money.  He testified that during the week or two preceding September 2, 2007, Mr. Russell had become enraged about the building situation, and Petitioner became afraid of him.

Petitioner testified that Mr. Russell used crack cocaine and smoked marijuana "all the time." He testified that for a period of months, a young boy and two girls came to the house late at night and smoked crack cocaine all night in Mr. Russell's room.  Petitioner testified that Mr. Russell became "wild" when he smoked crack, and very agitated when he smoked marijuana.  Petitioner testified that Mr. Russell kept several loaded firearms in his room, and he also kept large amounts of cash on his person.  Petitioner testified that Mr. Russell kept a .45 in a cabinet, a .45 in the closet, a .38 laying on his desk, two shotguns in the closet, and a musket in the closet.  He testified that he repeatedly told Mr. Russell that he did not want the guns or drugs in the house.  He testified he called the Sheriff's Office on September 1, 2007, because he wanted Mr. Russell's guns and drugs out of his house.  He testified that Deputy Ruppert told him that he could not help him, and then talked to Mr. Russell, which "agitated the problem."  Petitioner testified that after Deputy Ruppert left, Mr. Russell became enraged, started cursing, and said he would "get" Petitioner for calling law enforcement.  Petitioner testified that later on, he removed the shotguns from Mr. Russell's room while Russell was out, and put them under a parked car behind the house.  Petitioner testified he (Petitioner) was afraid of what Mr. Russell might do if he discovered that Petitioner removed two of his guns from his room, so he (Petitioner) barricaded his bedroom door with a chair, a desk, and a dresser that night.

Petitioner testified that the next day, he realized that Mr. Russell had installed a lock on his (Russell's) bedroom door, and Petitioner got mad and told him he could not do that, because the house was rented.  Petitioner testified he tried to take the lock off the door, but Russell grabbed his hand.  He testified that Mr. Russell came out of his room with some clothes to take to the washroom in the garage.  He testified that at noon or 1:00 p.m., he was in the "TV room," when the dog ran in the room and behind him.  He testified that Mr. Russell then came into the room cursing and saying he was going to kill the dog.  Petitioner testified he opened the back door to let the dog out, and the dog jumped on Mr. Russell's cat.  He testified that Mr. Russell said, "You no good son of a bitch,

I'll kill you for that," and then pushed Petitioner down the steps.  Petitioner testified he got up and thought that Mr. Russell was going to kill him.  He testified he retrieved the loaded shotguns from under the car, carrying one in each hand.  Petitioner testified that he hurriedly went into the house through the back door, because he knew that Mr. Russell would kill him if he didn't move quickly.  Petitioner testified that he did not call police, because police would not have arrived quickly enough.  He testified that he did not go to a neighbor's house because he believed that Mr. Russell would step out of the house and shoot him.  Petitioner testified that upon entering the back door of the house, he "eased around" to Mr. Russell's room and saw the door half closed.  He testified he opened the door with one of the shotguns, and saw Mr. Russell standing there, and then Russell "started making a motion to go into the closet."  Petitioner testified he said "Don't," and Russell moved, so he shot Russell in the chest.  He testified that Mr. Russell stood there, and Petitioner expected him to fall, but he didn't.  Petitioner testified that Mr. Russell stood there another two seconds and then pushed the door and started to come around the door.  Petitioner testified he (Petitioner) was trying to hold the door with one of the shotguns, and when Mr. Russell suddenly ran into the door, the shotgun went off and shot a hole through the door.  Petitioner testified that he jumped and ran, and when he turned around, he saw a large amount of blood come form under the door, and he knew that Mr. Russell was dead.  Petitioner testified that he did not intend to kill Mr. Russell.  He testified that his finger pulled the trigger when the door hit his hand.  Petitioner testified that approximately eight seconds elapsed between the first time he shot Mr. Russell and the second time he shot him.  He testified that after the shooting, he vomited, and then decided to get a drink, so he drank "half a bottle."  He testified that he decided that Mr. Russell "had to go," so he drug his body out the back door, and placed the body on the tarp.  He testified he then got another drink and tried to mop up the blood.  He testified that by that time, he was feeling the effects of the alcohol, so he sat down and eventually went into his bedroom and went to sleep.

Petitioner testified that the next day, he pulled the tarp to the shade because Mr. Russell's body was in the sun, and he saw a large sum of money in Mr. Russell's pocket.  He testified he cut Mr. Russell's pocket with a knife, took the money, and then covered the body with the tarp.  Petitioner denied that he killed Mr. Russell for the purpose of taking his money.  He testified that

he put the money on a table, and then heard someone at the front door, so he put the money in his

pocket.  Defense counsel continued the direct examination as follows:

> Q.      Did you try to hide anything or did you invite them [law enforcement officers] into the residence?
>
> A.      I invited them to come on in, and I think there was two to four police there.  I'm not sure how many.  I know there was two, and they came on in.  And there was a visible trail right out the back door.  I mean, it's easy to see where he was.  It was right out the back.  I told them—at one time I told them, he's out back.
>
> Q.      Did you have any plans to do anything other than to cooperate with the police after you let them in the house?
>
> A.      No.  It's just a bad situation.  I just told them I wanted to talk to my lawyer.  I wasn't going to tell them nothing.
>
> Q.      And did you continue—did you make a statement even after that?
>
> A.      I may have said a lot of things because I don't remember half of what happened.  I was still in a state of shock, really drunk, too.

(Ex. J at 465–66).  Petitioner testified he had a lot of alcohol to drink, but at that time, he was not

aware that his blood/alcohol level was 0.4.

On cross-examination, Petitioner testified that Deputy Ruppert lied when he testified that

during his first visit to the house, Petitioner admitted he had pried the lock off Mr. Russell's door

(Ex. J at 467–82).  Petitioner testified that Mr. Russell did not install the lock on his bedroom door

until after the Deputy left.  He testified that when he saw the lock, he tried to pry it off with a black

pry bar, but Mr. Russell walked in behind him and grabbed his arm, so he put the pry bar on the

table.  Petitioner testified that the pry bar remained on the table, and never left the house.  When the

prosecutor showed Petitioner a picture of a black pry bar lying on the ground outside the house, and

asked Petitioner if that was the pry bar, Petitioner testified that he was not sure, because he had three

or four pry bars.  The prosecutor asked Petitioner why he hid the body, and Petitioner responded that

he did not hide the body, he just happened to take it to the back yard, and he covered it with a tarp

only because it was sitting in the hot sun.  The prosecutor asked Petitioner why he tried to clean up

the scene of the killing, and Petitioner responded that he tried to clean up the blood on the floor so

he could walk.  Petitioner testified he did not remember putting the shotguns under his bed.  The prosecutor asked Petitioner what he told police when they arrived and asked the whereabouts of Mr. Russell.  Petitioner testified he told police, "He's gone."  He testified he did not remember saying that Russell had gone to the store, and that the officers who testified that he told them that "could be lying."  When the prosecutor asked Petitioner whether he lied to police about Mr. Russell's whereabouts when police first asked him, Petitioner admitted, "I guess I did."  Petitioner stated that Deputy Ruppert lied when he testified that Petitioner never mentioned any guns when Ruppert responded to Petitioner's 911 call the day prior to the murder.  The cross-examination continued:

> Q.      . . . Now, eventually, at some point after they found the body, you then told them that you had killed him?
>
> A.      I don't think I said I killed him.  I think I said he's dead.
>
> Q.      Well, did you tell them that you killed him because he was starting to be a sorry bastard?
>
> A.      No, but I did tell them he was a sorry bastard.
>
> Q.      But you didn't tell them that's why you killed him?
>
> A.      He told me himself he was a sorry bastard.
>
> Q.      Well my question, sir, is, did you tell the police you killed him because he was starting to be a sorry bastard?
>
> A.      No.
>
> Q.      All right.
>
> A.      I told them I wanted to talk to my lawyer.
>
> Q.      Did you think you had done anything wrong when you killed Mr. Russell?
>
> A.      In my heart I felt like it was wrong, but it was necessary.
>
> Q.      Did you tell the police at least three times, I'm fixing to get the electric chair for this?

A.      I might have mentioned it out in the car joking.

Q.      Joking?

A.      Yeah.

Q.      You're joking about—didn't you say, I'm going to getting F-ing death sentence for this?  I'm fixing to get the electric chair for this.  I'm probably going to get the electric chair for it.  Didn't you say that?

A.      I don't know if I said all of that.

Q.      But you're saying if you did you were joking?

A.      They was dragging me in the car and had me all bloody from handcuffs, poked me in the car, and I hollered help four times.

(Ex. J at 478–80).

On re-direct examination, defense counsel elicited the following testimony:

Q.      Mr. Vines, Mr. Rimmer asked you about the statement that you made afterwards.  Were you aware that Escambia County Sheriff's Officer Stripling [sic] didn't even know how to advise you of <u>Miranda</u>?  Were you aware of that—in an effective legal way?

A.      I wasn't aware of it.

Q.      Are you aware that you also told the officers who were questioning you that he was threatening me, referring to Ross Russell?

Mr. Rimmer asked you about your statements that you made in the back of the cruiser and about what you said you did.  Do you remember telling them, and he was threatening me as well?

A.      I remember saying that.

(Ex. J at 483).

The State re-called Deputy Sterling as a rebuttal witness (Ex. J at 632–71).  The prosecutor asked her if Petitioner talked to her or answered her questions while he was in the back seat of the patrol car, and Sterling answered yes.  Deputy Sterling testified that Petitioner voluntarily spoke to her and answered her questions; that she did not promise him anything or threaten him in order to

get him to talk.  She testified that she asked Petitioner who killed Mr. Russell, and Petitioner said, "I did."  She testified that Petitioner told her that Mr. Russell "started to be a sorry bastard."  She testified that Petitioner told her he was "going to get the fucking electric chair" and was "going to get the death sentence."  She testified that Petitioner said "the sorry bastard deserved it," and that he hit Mr. Russell in the head, shot him, and put him in a tarp in the back yard.  Deputy Sterling testified that Petitioner did not tell her that Mr. Russell had threatened to kill him and a dog.  On cross-examination, Deputy Sterling admitted that she now knew that the Miranda warnings she gave Petitioner were legally ineffective and insufficient, but she was not aware of that at the time she gave Petitioner the advisory.  She repeated that Petitioner voluntarily spoke to her.  Defense counsel extensively cross-examined Deputy Sterling with the use of the transcript of the audio recording of Petitioner's statements in the patrol car.  On re-direct the court permitted the prosecutor to ask Deputy Sterling to read certain portions of the transcript.  Those portions included Petitioner's statement that he killed Mr. Russell, that Russell "started to be a sorry bastard," that Petitioner was "fixing to get the electric chair for this"; that Mr. Russell was "a dead son of a bitch and he deserved it and I killed him"; that "I'm going to get the fucking death sentence for this shit"; and that "I shot and killed the fucking guy that's living in my house."

Because the trial court granted the motion to suppress the statements made by Petitioner in the patrol car, on the ground that the Miranda warnings were defective, the State could not admit those statements as substantive evidence at trial unless Petitioner "opened the door" to their admission.  Under Florida law, the concept of "opening the door" allows the admission of otherwise inadmissible testimony to qualify, explain, or limit testimony or evidence previously admitted; the concept of "opening the door" is based on considerations of fairness and the truth-seeking function of a trial as without the fuller explication, the testimony that opened the door would have been incomplete and misleading.  *See* Hudson v. State, 992 So. 2d 96, 110 (Fla. 2008), *as revised on denial of reh'g*, (Sept. 25, 2008) and *cert. denied*, 129 S. Ct. 1360, 173 L. Ed. 2d 621 (2009); Lawrence v. State, 846 So. 2d 440, 452 (Fla. 2003); Rodriguez v. State, 753 So. 2d 29 (Fla. 2000); Edwards-Freeman v. State, 93 So. 3d 497 (Fla. 4th DCA 2012) (in order to "open the door," the witness must offer misleading testimony or make a specific factual assertion which the opposing

party has the right to correct so that the jury will not be misled); <u>Redd v. State</u>, 49 So. 3d 329 (Fla. 1st DCA 2010); <u>Brunson v. State</u>, 31 So. 3d 926 (Fla. 1st DCA 2010); <u>Crumbie v. State</u>, 16 So. 3d 893 (Fla. 1st DCA 2009); *see also* 24 Fla. Jur. 2d Evidence and Witnesses § 902.  To introduce otherwise inadmissible evidence under the "opening the door" rule, the State must demonstrate a legitimate need to resort to such evidence to correct a false impression; otherwise, the "opening the door" rule threatens to become a pretext for the illegitimate use of inadmissible evidence, and the fairness-promoting purpose of the rule is lost.  <u>Redd</u>, 49 So. 3d at 329.  The concept of "opening the door" is triggered when one party's evidence presents an incomplete picture and fairness that demands the opposing party to be allowed to follow up in order to clarify and make it complete. <u>Brunson</u>, 31 So. 3d 926.  Fairness is thus the key concern of the evidentiary principle of "opening the door," and the mere fact that testimony may be characterized as incomplete or misleading does not automatically trigger the admission of otherwise inadmissible evidence under the "opening the door" rule.

Additionally, it was legally permissible for the State to use Petitioner's statements to impeach his credibility, so long as the statements were voluntary.  *See* <u>Oregon v. Hass</u>, 420 U.S. 714, 95 S. Ct. 1215, 43 L. Ed. 2d 570 (1975) (a substantive violation of <u>Miranda</u> does not preclude a defendant's voluntary statement from being used for impeachment purposes); <u>Harris v. New York</u>, 401 U.S. 222, 91 S. Ct. 643, 28 L. Ed. 2d 1 (1971); <u>Nowlin v. State</u>, 346 So. 2d 1020 (Fla. 1977) (a defendant's voluntary statement made in technical violation of <u>Miranda</u> may be used to impeach); <u>Reaves v. State</u>, 458 So. 2d 53, 54 (Fla. 3d DCA 1984); <u>Hughey v. State</u>, 411 So. 2d 1021 (Fla. 5th DCA 1982).  If a defendant objects to introduction of such statements, for impeachment purposes, on the ground that the statements were not voluntary, the State has the burden of proving by a preponderance of the evidence that the statements were voluntarily obtained, and the trial court must make a determination of voluntariness outside the presence of the jury.  *See* <u>Roman v. State</u>, 475 So. 2d 1228 (Fla. 1986); <u>Nowlin</u>, 346 So. 2d at 1024.  Voluntariness is determined by examining the totality of the circumstances surrounding the statement, including whether or not the defendant was read his rights.  *See* <u>Traylor v. State</u>, 596 So. 2d 957 (Fla. 1992); <u>Roman</u>, 475 So. 2d at 1232.

Initially, Petitioner failed to show that trial counsel was ineffective for failing to challenge the admissibility or use of Petitioner's statements, on the ground that the statements were involuntary.  While there was evidence that Petitioner was under the influence of alcohol and in an emotional state when he made the statements in the patrol car, there was no evidence that Petitioner's statements in the police car were the product of any threat, promise, or force.  Therefore, Petitioner failed to show a reasonable probability that the trial court would have properly ruled the statements inadmissible if defense counsel had objected on the ground that the State could not establish, by a preponderance of the evidence, that the statements were voluntarily made.

Additionally, Petitioner failed to show that his trial counsel was ineffective for failing to properly prepare himself and Petitioner for trial.  During the State's case-in-chief, the jury heard the following testimony:  (1) law enforcement's presence at Petitioner's house the day after the killing was initiated by a third party, not Petitioner; (2) officers observed that someone had attempted to clean up evidence of the killing; (3) officers found two shotguns under Petitioner's bed; (4) Mr. Russell's body was moved from his bedroom to the back yard and wrapped in a tarp; (5) Petitioner did not immediately admit to law enforcement that Mr. Russell was dead when the officers inquired as to Mr. Russell's whereabouts; (6) Petitioner revealed Mr. Russell's death only after the officers discovered blood and brain matter in Mr. Russell's bedroom, at which time Petitioner stated, "He's dead," "I'm screwed," "Oh shit," and "I'm done" (the offices testified that Petitioner made these statements prior to being placed in the patrol car and given <u>Miranda</u> warnings); (7) officers found a large sum of money in Petitioner's pockets, and (8) Mr. Russell had pulled a large sum of money from his own pocket the day before the killing.

The theory of self-defense could not have been credibly presented to the jury without Petitioner's testimony.[9]  Although Dr. Berkland and Ms. Johnson provided testimony as to their theory of the location and position of Mr. Russell's body and the sequencing of the non-fatal shot to the chest and fatal shot to the head, and other witnesses testified regarding Mr. Russell's outbursts of rage and threats to kill people, and his keeping several guns in his bedroom, Petitioner was the

---

[9] Indeed, Petitioner does not contend that his decision to testify on his own behalf was the result of ineffective assistance of defense counsel.

only person who could tell the jury about circumstances leading up to the killing in order to suggest that his killing of Mr. Russell on September 2, 2007, was justified.  The jury having heard evidence suggesting that Petitioner attempted to hide his killing of Mr. Russell, it was reasonable for defense counsel to address this evidence during Petitioner's testimony in order to present a credible theory of self-defense.  A reasonable way of doing this was eliciting testimony from Petitioner that he was very intoxicated and in a state of shock immediately following the killing, and that he was cooperative with law enforcement when they arrived at his home, and did not intend to hide the killing from them.  It does not appear that either defense counsel's questions or Petitioner's answers on direct examination "opened the door" to admission of his statements in the patrol car, because Petitioner's answers to counsel's questions did not create a false impression of his interaction with law enforcement such that fairness demanded that the State be allowed to follow-up by asking Petitioner the content of his statements to Deputy Sterling in the patrol car.

As the state court found, the previously-suppressed statements were brought up when the prosecutor asked Petitioner whether he told officers that he killed Mr. Russell because Russell was "starting to be a sorry bastard," which was one of Petitioner's statements in the patrol car.  Defense counsel was arguably deficient for failing to object to the prosecutor's question.  However, to prove ineffectiveness to the state post-conviction court, Petitioner needed to demonstrate not only deficient performance, but also that there was a reasonable probability he would not have been convicted of first degree murder if the jury had not heard his statements in the patrol car.  The state court concluded that Petitioner failed to satisfy this burden, because the evidence of guilt was overwhelming, the jury properly heard Petitioner's statements "He's dead," "I'm screwed," "Oh shit," and "I'm done," and Petitioner's statements in the patrol car did not necessarily conflict with his theory of self-defense.  Petitioner having now brought the issue to this federal court for review under § 2254, Petitioner must demonstrate that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Richter, 562 U.S. at 102–03.  Upon review of the trial transcript, the undersigned concludes that Petitioner has not satisfied this burden.

Having failed to demonstrate that the state court's adjudication of his claim is based upon an unreasonable determination of the facts, or that it is contrary to or an unreasonable application of <u>Strickland</u>, Petitioner is not entitled to habeas relief on Ground One, sub-claim (1).

    B.    <u>Ground One, sub-claim (2):  "Defense counsel was ineffective for failing to argue, present evidence, move for a judgment of acquittal and request a special jury instruction on the felony murder charge utilizing the "afterthought" defense, which would have defeated the State's felony murder theory."</u>

Petitioner alleges the State presented evidence and argued that Petitioner killed Mr. Russell in the course of taking his money (doc. 1 at 17–24).  He alleges his trial counsel argued that the prosecutor's theory that the killing occurred in the course of a robbery was purely speculative, and that the facts were equally susceptible of the conclusion that Petitioner took Mr. Russell's money as an afterthought (*id.*).  Petitioner asserts he testified at trial that he did not take Mr. Russell's money until the day after the killing, and he did so by cutting the pocket of Mr. Russell's clothing (*id.*).  He asserts the physical evidence supported his theory, specifically, evidence that Mr. Russell's pocket was cut (*id.*).  Petitioner contends trial counsel was ineffective for failing to make a renewed motion for judgment of acquittal ("JOA") at the close of the evidence (*id.*).  He contends if trial counsel had made a renewed motion for JOA as to the charge of felony murder, the trial court would have more than likely granted the motion (*id.*).  He also asserts counsel's failure to renew the motion denied Petitioner appellate review of his sufficiency of the evidence claim (*id.*).

Petitioner alleges that although his post-conviction counsel asserted this claim in the heading of one of the claims asserted in his amended Rule 3.850 motion (Claim II), post-conviction counsel focused his argument on trial counsel's failure to request a jury instruction on the "afterthought" exception (doc. 1 at 17).  He alleges that upon his own review of the amended Rule 3.850 motion, he told post-conviction counsel that trial counsel <u>did</u> request an "afterthought" instruction, and that post-conviction counsel needed to re-focus his argument on trial counsel's failure to make a renewed motion for JOA on the felony murder charge (*id.*).  Petitioner contends his post-conviction counsel did not do so, and the state court addressed only trial counsel's failure to request an "afterthought" instruction in its written order denying the amended Rule 3.850 motion (*id.*).  Petitioner asserts that if this federal court finds that he did not fairly present his IATC claim regarding counsel's failure

to renew a motion for JOA, he is still entitled to federal review of his claim due to ineffective assistance of post-conviction counsel, pursuant to Martinez v. Ryan, 132 S. Ct. 1309 (2012) (*id.* at 17, 19).

Respondent contends that even though Petitioner's post-conviction counsel focused his argument on trial counsel's failure to request an "afterthought" instruction, and Petitioner focused the argument in the instant § 2254 petition on trial counsel's failure to renew the motion for JOA at the close of the evidence, both arguments focus on the same thing, that is, counsel's failure to seek relief at trial on the felony murder theory based on the insufficiency of the evidence supporting robbery as the underlying felony (doc. 20 at 33–35). Therefore, the IATC claim that Petitioner presents in his § 2254 petition was exhausted in the state courts (*id.*). Respondent further contends that the state court adjudicated the claim on the merits, because the court's determination that Petitioner could not demonstrate prejudice, because a conviction for premeditation would have been proper, disposed of his argument that trial counsel was ineffective for failing to defeat the State's felony murder theory (*id.* at 35–39). Respondent contends the state court's adjudication of Petitioner's claim was not contrary to or an unreasonable application of Strickland, because there was evidence from which any rational trier of fact could find beyond a reasonable doubt that Petitioner intended that Mr. Russell die when he twice shot him with a shotgun (*id.* at 39–44). Therefore, Petitioner is not entitled to federal habeas relief (*id.*).

In Petitioner's reply, he contends the state court's determination as to the prejudice prong of the Strickland standard was an unreasonable application of the law in relation to the facts (doc. 26 at 5).

In Petitioner's amended Rule 3.850 motion, he raised the following claim as Issue II:

Defense Counsel was Ineffective for failing to argue, present evidence, move for a judgment of acquittal and request a special jury instruction on the felony murder charge utilizing the "afterthought" defense, which would have defeated the state's felony murder theory.

(Ex. BB at 48). This is also a verbatim statement of Ground One, sub-claim (2) of Petitioner's § 2254 petition (*see* doc. 1 at 17). Petitioner included in his § 2254 argument nearly all of the legal argument and case citations included in his amended Rule 3.850 motion, except he omitted the

assertion that trial counsel failed to request an "afterthought" instruction, and added argument that if trial counsel had made a renewed motion for JOA as to the felony murder theory, the trial court would have more than likely granted the motion.

The state circuit court adjudicated the claim as follows:

> At trial, the jury was instructed on both felony murder and premeditated murder.[FN 14]  A general verdict form was used and Defendant was found guilty as charged.[FN 15]  However, Defendant claims that counsel should have requested that the jury be instructed that if the robbery was an afterthought, it cannot be the felony basis for felony murder.

> [FN 14:  See Attachment 4, trial transcript excerpts, pp. 740–742.]

> [FN 15:  See Attachment 5, verdict form.]

> If a general verdict form is used, there must be competent, substantial evidence supporting either premeditated or felony murder.  See Fitzpatrick v. State, 900 So. 2d 495, 508–509 (Fla. 2005).  Evidence of premeditation includes the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.  See Abdool v. State, 53 So. 3d 208 (Fla. 2010); Cummings v. State, 696 So. 2d 1305 (Fla. 5th DCA 1997) (evidence that the defendant and the victim were engaged in a heated argument before the murder and that the defendant shot the victim several times at close range was sufficient to establish premeditation).

> First, the record reflects that defense counsel filed a written motion requesting that the jury be given the "afterthought instruction," and that it was given to the jury.[FN I6]  Therefore, counsel was not deficient as Defendant alleges.

> [FN 16:  See Attachment 6, motion.  See also Attachment 4, trial transcript excerpts, p. 742.]

> Next, it is apparent that the evidence would have also supported a charge of premeditated murder.  Defendant testified at trial as to the previous difficulties between Defendant and the victim, his roommate.[FN 17]  Defendant had called the police out to their home the day before the murder, to complain that the victim was keeping marijuana and guns in his bedroom.  Subsequently, Defendant removed the guns from the victim's bedroom and hid them in the backyard.  By Defendant's own account, the two men were having a heated argument when Defendant retrieved a

gun from the backyard and brought it back into the house, where the victim was shot several times.  The medical examiner testified that the victim had shotgun wounds to his head, chest, thigh and hand.[FN 18]  She also testified that the shot to the head knocked the brain out of the victim's skull, to the extent that the brain was collected in a separate plastic bag.  Moreover, she testified that the pattern of the wounds on the victim appeared to indicate in her opinion that the victim was "lying down, or reclining with his knew [sic] bent and his left heel on the ground."

[FN 17:  See Attachment 4, trial transcript excerpts, pp. 434–459.]

[FN 18:  See Attachment 4, trial transcript excerpts, pp. 309–311.]

Accordingly, Defendant also cannot demonstrate prejudice because the Court finds that a conviction for premeditation murder would have also been appropriate. Defendant is not entitled to relief on this claim.

(Ex. CC at 64–65).  Petitioner argued this issue on appeal to the First DCA (Ex. EE at 27–29).  The First DCA affirmed the lower court's decision without written opinion (Exs. GG).

To satisfy the exhaustion requirement, a petitioner must have presented the instance of ineffective assistance that he asserts in his federal petition "such that a reasonable reader would understand [the] claim's particular legal basis and specific factual foundation."  McNair, 416 F.3d at 1302; see also Johnston v. Singletary, 162 F.3d 630, 634–35 (11th Cir. 1998); Weeks v. Jones, 26 F.3d 1030, 1044–46 (11th Cir. 1994) (rejecting petitioner's argument that "the general claim of ineffective assistance in state court preserves for federal review all alleged instances of ineffectiveness, regardless of whether evidence of a particular act was presented to the state court"); Footman v. Singletary, 978 F.2d 1207 (11th Cir. 1992).  To sufficiently exhaust a claim, the petitioner must have presented the state court with the same particular legal basis for relief in addition to the facts supporting it.  See Kelley v. Sec'y for Dep't of Corr., 377 F.3d 1317, 1350 (11th Cir. 2004).  A claim presented in a federal petition that is "clearly distinct, in form and in substance" from the claim presented to the state courts is unexhausted.  Id. at 1348.

Here, the act of ineffectiveness that Petitioner presented to the state courts was trial counsel's failure to adequately challenge the State's alternative felony murder theory of the first degree murder charge by arguing, presenting evidence, moving for a judgment of acquittal, and requesting a special

jury instruction utilizing the "afterthought" defense. This is the same act of ineffectiveness that Petitioner presents in his § 2254 petition. Although he focused on the "afterthought" instruction in the state courts and focused on the motion for JOA in federal court, this refocusing did not render Ground One, sub-claim (2) clearly distinct, in form and in substance, from the claim he presented in Issue II of his amended Rule 3.850 motion such that the IATC claim presented in his federal petition is a new claim altogether. Therefore, the undersigned concludes that Petitioner fairly presented, and thus exhausted, Ground One, sub-claim (2).

As previously discussed, the First DCA denied relief without discussion. Section § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been "adjudicated on the merits." *See* <u>Richter</u>, 562 U.S. at 99. When a state court issues an order that summarily rejects without discussion all the claims raised by a defendant, including a federal claim that the defendant subsequently presses in a federal habeas proceeding, the federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits in the absence of any indication or state-law procedural principles to the contrary. *Id.* The presumption may be overcome when there is a reason to think some other explanation for the state court's decision is more likely. *Id.* at 99–100. The same rule applies when the state court addresses some but not all of the federal claims raised by a defendant. When a federal claim has been presented to the state court, and the state court opinion addresses some but not all of defendant's federal claims, a rebuttable presumption arises on federal habeas review that the state court adjudicated all of the federal claims on the merits. *See* <u>Johnson v. Williams</u>, — U.S. —, 133 S. Ct. 1068, 1094, 185 L. Ed. 2d 105 (2013). Here, Petitioner has not rebutted the presumption that the First DCA adjudicated the merits of his IAC claim.[10] Therefore, § 2254(d) applies. *See* <u>Richter</u>, 562 U.S. at 100.

This court must abide by the state court's interpretation of state law. *See* <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005); <u>Mullaney v. Wilbur</u>, 421 U.S. 684, 691, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975). Therefore, this court is bound by the state court's

---

[10] Because the First DCA's decision in the Rule 3.850 proceeding was the last state court adjudication of the merits of the federal claim, it is that adjudication that is reviewed under § 2254(d). *See* <u>Hitton v. GDCP Warden</u>, 759 F.3d 1210, 1231 (11th Cir. 2014) (citing <u>Newland v. Hall</u>, 527 F.3d 1162, 1198–99 (11th Cir. 2008)).

determination that in Florida, if a general verdict form is used, there must be competent, substantial evidence supporting either premeditated or felony murder.  This court is also bound by the state court's determination that the evidence adduced at Petitioner's trial was sufficient to support a conviction for first degree premeditated murder under Florida law.  In light of these determinations, the state court did not unreasonably apply <u>Strickland</u> in concluding that Petitioner failed to show a reasonable probability of a different outcome if defense counsel had adequately challenged the State's alternative felony murder theory of the first degree murder charge by arguing, presenting evidence, moving for JOA, and requesting a special jury instruction utilizing the "afterthought" defense.  Therefore, Petitioner is not entitled to federal habeas relief on Ground One, sub-claim (2).[11]

> C.     <u>Ground One, sub-claim (3):  "Defense counsel rendered ineffective assistance of counsel by failing to object to the improper remarks made by the State during its closing argument."</u>

Petitioner asserts that his trial counsel permitted the prosecutor to make highly inflammatory, improper, and prejudicial remarks during closing arguments, including comments on Petitioner's right to remain silent (doc. 1 at 24–31).  Petitioner identifies the allegedly objectionable argument as follows:

> And, of course, you know what he told Deputy Sterling.  He didn't say anything about this incident that supposedly happened, you know, about the dog and the dog supposedly running in the house and hiding behind him and more or less saying, you know, save me, save me, you know.  And then Mr. Russell coming in, going to kill him and the dog.  He didn't tell that.  No, that's not what he told the police.  He comes in here, though, and he tells a new and improved story, a new and improved story.  Yeah, it was all about the dog.  I'm in the house.  Mr. Russell was out in the garage.  I hear the dog yelp.  The dog runs in the house.  The dog takes refuge behind me.  Mr. Russell comes in, says he's going to kill the dog.  We get into an

---

[11] Even if the variance in the claim presented to the state courts and the claim presented here was sufficient to render the claim unexhausted for federal habeas purposes, Petitioner still would not be entitled to relief.  Upon de novo review of Petitioner's claim, the undersigned concludes that for the reasons discussed *supra*, Petitioner's allegations fail to satisfy the <u>Strickland</u> standard.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 390, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010) (federal habeas courts can deny writs of habeas corpus under § 2254 by engaging in de novo review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review) (citing 28 U.S.C. § 2254(a)).

altercation. He slams the door. I fall down the stairs. It just so happens I had removed the two shotguns before, had them hidden out in the backyard, under a car in the backyard. Does that even make sense to you? Does that even make sense? And yesterday he said, oh, he couldn't remember why he had hid the guns. He denied specifically saying that Mr. Russell was starting to become a sorry bastard. He said he never said that. You heard it from the transcript. And, you know, he said, yeah, not only did Mr. Russell smoke marijuana, he smoked crack cocaine a lot. A lot is what he said. There was some testimony that supposedly some young guy and young girl came there and they had smoked crack cocaine all night long in his room, but the only drugs found by the police was the marijuana. Is he exaggerating? Is he trying to embellish his new and improved story? And he said something else I thought was interesting. He said he called the sheriff's department the day before. One of the reasons he called was because the deadline was drawing near for Mr. Russell's plans to kill the building inspectors. Remember that? Wow. How come he didn't tell the police that? How come when the officer came out he didn't, say, you need to know something. My roommate, he's a scary guy. He has threatened to kill the building inspectors and the deadline is drawing near. He's fixing to leave and go to the Philippines to be with his girlfriend, but before he leaves he plans to kill these guys. You need to check that out. Never told them that. He tells you that in his new and improved story. So what do you do here, folks? You add up the facts. The facts presented by the defendant don't add up. The facts that he presents and wants you to believe don't add up to self-defense. They only add up to murder. Because when he was arrested, his pockets were full of money. His heart was full of murder. Thank you very much.

(*id.* at 24–25). Petitioner contends counsel should have objected to the comments on the ground that they were improper comment on Petitioner's right to remain silent (*id.* at 26). He additionally contends that the comments suggesting that his trial testimony was a new story he made up after the killing, and that if it had been a true story, he would have told law enforcement, improperly shifted the burden to the defense to prove Petitioner's innocence (*id.* at 26–28). He contends the prosecutor's comment, "The facts that he presents and wants you to believe don't add up to self-defense. They only add up to murder. Because when he was arrested, his pockets were full of money. His heart was full of murder" constituted an improper statement of personal opinion, and an improper appeal to the jury's emotions (*id.* at 28). Petitioner contends but for the improper remarks of the prosecutor, there is a reasonable probability the outcome of the trial would have been different (*id.* at 28–29).

Respondent asserts that it appears that Petitioner exhausted this IATC claim (doc. 20 at 44–49). Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 50–53).

Petitioner raised this IATC claim as Claim III in his amended Rule 3.850 motion (Ex. BB at 50–56). The state circuit court adjudicated the claim as follows:

> Defendant claims that the State's closing arguments made an impermissible comment on Defendant's right to remain silent. Defendant also avers that the State's argument had the effect of shifting the burden onto Defendant to prove his innocence and stating the personal opinion of the prosecutor.
>
> As a general proposition, wide latitude is permitted in arguing to a jury during closing argument. Breedlove v. State, 413 So. 2d 1, 8 (Fla. 1982). However, comments give rise to error warranting mistrial when they are so prejudicial as to vitiate the entire trial. Paul v. State, 958 So. 2d 1135, 1136 (Fla. 4th DCA 2007). Prosecutorial improprieties warranting a mistrial must be so repetitious and egregious that they become a feature of the trial and deny a defendant the fundamental right to a fair trial. See Toler v. State, 95 So. 3d 913 (Fla. 1st DCA 2012) (prosecutor's references to the defendant's race, as being a liar, and to matters for which there was absolutely no support in the record, in a manner both pejorative and sarcastic were so invasive and inflammatory as to warrant a mistrial.) Conversely, in Moore v. State, the Court found that two isolated references to the defendant as "the devil" in the prosecutor's closing argument, although ill-advised, were not problematic enough to vitiate an entire trial on a postconviction motion. 820 So. 2d 199, 207 (Fla. 2002).
>
> "The purpose of closing argument is to present a review of the evidence and suggestions for drawing reasonable inferences from the evidence." Fleurimond v. State, 10 So. 3d 1140, 1148 (Fla. 3d DCA 2009). See also Pierre v. State, 88 So. 3d 354 (Fla. 4th DCA 2012) ("During closing argument, the prosecutor must confine argument to evidence in the record and not make arguments which cannot be reasonably inferred from the evidence.") While it is improper for a prosecutor to express a personal belief of the guilt of the accused, see Pacifico v. State, 642 So. 2d 1178, 1184 (Fla. 1st DCA 1994), when the evidence against the defendant is overwhelming, these comments are harmless error at most. See Jones v. State, 449 So. 2d 313, 314–315 (Fla. 5th DCA) ("Where the case against a defendant is weak or tenuous, a prosecutor's contentions that the defendant is a liar could rarely, if ever, be construed as harmless error.") Finally, comments by the prosecutor do not undermine the evidence of the Defendant's guilt. See Geralds v. State, 35 Fla. L. Weekly S503 (Fla. Sept. 16, 2010).

The instant case was not weak or tenuous.  Furthermore, the complained-of comments are not the type of "vituperative or pejorative characterizations of a defendant," or "needless sarcasm," revealing that the prosecutor has "abandoned any semblance of professionalism," which would warrant a mistrial.  See Gore v. State, 719 So. 2d 1197, 1201 (Fla. 1998).  The Court has reviewed the record and has found that none of the State's comments at trial could be considered to be so improper as to vitiate the entire trial.[FN 19]   The Court instructed the jury that closing arguments are not evidence.[FN 20]   Furthermore, it also appears that defense counsel responded to many of these comments by the State, either neutralizing them or arguably turning them to the defense advantage.  The Court finds that defense counsel was both active and discerning in posing objections throughout the trial.  There is no reasonable probability that the result of the proceeding would have been different had counsel shown greater diligence in raising objections to the prosecutor's statements.  Sims v. State, 602 So. 2d 1253 (Fla. 1992).  Finally, the Court finds that even if any of these incidents of alleged prosecutorial misconduct had been preserved for appellate review, that they would have either been found on appeal to be without merit or, at most, harmless error.[FN 21] Accordingly, Defendant is not entitled to relief.

[FN 19:  See Attachment 4, trial transcript excerpts, pp. 683–738.]

[FN 20:  See Attachment 4, trial transcript excerpts, pp. 679–680.]

[FN 21:  The Court is also aware that it is a common trial strategy to be conservative with objections in order to avoid antagonizing the jury and losing credibility.  See Brown v. State, 846 So. 2d 1114, 1122 (Fla. 2003).]

(Ex. CC at 145–47).  Petitioner argued this issue in his initial brief on appeal to the First DCA (Ex. EE at 29–39).  The First DCA affirmed the lower court's decision without written opinion (Ex. GG).

Under Florida law, wide latitude is permitted in arguing to a jury.  See Breedlove v. State, 413 So. 2d 1, 8 (Fla. 1982) (citations omitted).  Logical inferences may be drawn, and counsel is allowed to advance all legitimate arguments.  See id.  The prosecutor may not, however, "inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant rather than the logical analysis of the evidence in light of the applicable law." Jones v. State, 612 So. 2d 1370, 1374 (Fla. 1993).  Whether comments made in closing arguments are improper and prejudicial is a determination that must be made by viewing those comments in

the context of the closing arguments as a whole and in the context of the entire record.  *See* Watson
v. State, 651 So. 2d 1159, 1163 (Fla. 1994).

The prosecutor may not make arguments which voice a personal opinion based upon
evidence that was not presented to the jury, *see* United States v. Granville, 716 F.2d 819, 822 (11th
Cir. 1983), or arguments which shift the burden of proof to the defense, *see* United States v. Simon,
964 F.2d 1082, 1086 (11th Cir. 1992).  However, a prosecutor may argue both facts in evidence and
reasonable inferences from those facts.  *See* Tucker v. Kemp, 762 F.2d 1496, 1506 (11th Cir. 1985)
(citations omitted).  If the evidence is too insubstantial to support a reasonable inference, the
prosecutor's comment will be deemed improper.  *Id.* at 1507.  Prosecutors must observe the
distinction between the permissible practice of arguing evidence and suggesting inferences which
the jury may reasonably draw from it, and the impermissible practice of arguing suggestions beyond
the evidence.  *See* Simon, 964 F.2d at 1086 (citation omitted).  However, the prosecutor is not
limited to a bare recitation of the facts; he may comment on the evidence and express the
conclusions he contends the jury should draw from the evidence.  United States v. Johns, 734 F.2d
657, 663 (11th Cir. 1984).

A prosecutor may comment on the uncontradicted or uncontroverted nature of the evidence
and may point out that there is an absence of evidence on a certain issue during closing argument
to the jury.  *See* White v. State, 377 So. 2d 1149 (Fla. 1980).  Further, prosecutorial comment upon
a general lack of defense evidence is permissible.  *See* Smiley v. State, 395 So. 2d 235 (Fla. 1st DCA
1981).

The prosecutor may not make arguments which invite the jury to consider constitutionally
protected silence as evidence of the defendant's guilt.  *See* Fugate v. Head, 261 F.3d 1206, 1223
(11th Cir. 2001).  However, the "silence" at issue must be occasioned as an exercise of the right to
remain silent during a custodial interrogation.  *See* United States v. Venditti, 533 F.2d 217, 220 (5th
Cir. 1976) (prosecutor did not improperly comment on defendant's silence at the time he discussed
tax records with accountant, because the "silence" at issue was not occasioned as an exercise of the
right to remain silent during custody).  Further, when a defendant testifies before the jury in his own
defense, the credibility of his testimony is subject to attack during closing argument just as that of

any other witness.  *See* <u>State v. Murray</u>, 443 So.2d 955, 957 (Fla. 1984); <u>Burst v. State</u>, 836 So.2d 1107, 1109 (Fla. 3d DCA 2003).

Finally, "the limits of proper argument find their source in notions of fairness, the same source from which flows the right to due process of law."  <u>Houston v. Estelle</u>, 569 F.2d 372, 380 (5th Cir. 1978).  "The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  <u>Darden v. Wainwright</u>, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471, 91 L. Ed. 2d 144 (1986) (quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)).  Thus, to establish prosecutorial misconduct, a two-prong test must be satisfied:  (1) the prosecutor's comments must have been improper; and (2) the comments must have rendered the trial fundamentally unfair.  *See* <u>Eyster</u>, 948 F.2d at 1206 (citations omitted); <u>Brooks v. Kemp</u>, 762 F.2d 1383, 1400 (11th Cir. 1985) (en banc), *vacated on other grounds*, 478 U.S. 1016, 106 S. Ct. 3325, 92 L. Ed. 2d 732 (1986), *reinstated*, 809 F.2d 700 (11th Cir. 1987); <u>Dessaure v. State</u>, 891 So. 2d 455, 464–65 (Fla. 2004) (an order granting mistrial is required only when the error upon which it rests is so prejudicial as to vitiate the entire trial, making a mistrial necessary to ensure that the defendant receives a fair trial).

Here, Petitioner never invoked his right to remain silent.  *See* <u>Depree v. Thomas</u>, 946 F.2d 784, 793 (11th Cir. 1991) (finding meritless defendant's claim that prosecutor commented impermissibly on defendant's silence as defendant did not exercise his Fifth Amendment right to remain silent after his arrest, thus prosecutor could hardly have commented impermissibly on his silence); <u>Hutchinson v. State</u>, 882 So. 2d 943, 955 (Fla. 2004) (same).  Further, the prosecutor's comments, which called into question Petitioner's credibility by comparing his pre-<u>Miranda</u> statements to his post-<u>Miranda</u> statements and his testimony before the jury, related to the evidence and the credibility of that evidence.  The comments were not comments on Petitioner's invocation of his right to remain silent, nor did the comments improperly shift the burden to the defense to prove Petitioner's innocence.

Upon review of the evidence adduced at trial and the entirety of the arguments of the prosecutor and defense counsel during closing arguments (Ex. J at 683–738), the undersigned concludes—as did the state circuit court and the First DCA—that Petitioner failed to show that trial

counsel's failure to object to the comments identified by Petitioner constituted deficient performance, or that there is a reasonable probability the outcome of trial would have been different if counsel had objected to the comments.

Petitioner failed to demonstrate that the state court's adjudication of his IATC claim is based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of Strickland.  Therefore, he is not entitled to habeas relief on Ground One, sub-claim (3).

   D.   Ground One, sub-claim (4):  "The cumulative effect of defense counsel's ineffectiveness and the resulting prejudice requires a new trial."

Petitioner contends that the cumulative effect of the errors of trial counsel, described *supra*, when considered both individually and in their entirety, demonstrate that he is entitled him to a new trial (doc. 1 at 32).

 Respondent contends the Supreme Court has not held that distinct constitutional claims may be cumulated to grant habeas relief, and at least one federal circuit court of appeals has held that claims of cumulative error or effect are not cognizable on habeas review (doc. 20 at 54). Respondent argues that if this claim is cognizable in federal habeas, it appears that Petitioner exhausted the claim in the state courts (*id.* at 53–54).  Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 54–56).

Petitioner raised this claim as Claim IV in his amended Rule 3.850 motion (Ex. BB at 56–57).  The state circuit court adjudicated the claim as follows:

   Defendant's claim is without merit because the Court has considered each claim in his motion and found none to be a basis for relief.  See Downs v. State, 740 So. 2d 506, 509 (Fla. 1999).

(Ex. CC at 68).  Petitioner argued this issue in his initial brief on appeal to the First DCA (Ex. EE at 40).  The appellate court affirmed the lower court's decision without written opinion (Ex. GG).

In rejecting a similar "cumulative error" argument made by a § 2254 habeas petitioner, the Eleventh Circuit stated:  "The Supreme Court has not directly addressed the applicability of the cumulative error doctrine in the context of an ineffective assistance of counsel claim."  Forrest v. Fla. Dep't of Corr., 342 F. App'x 560, 564 (11th Cir. 2009) (per curiam) (unpublished but

recognized for persuasive authority) .  The <u>Forrest</u> panel further noted "[h]owever, the Supreme Court has held, in the context of an ineffective assistance claim, that 'there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt.'"  *Id.* at 564–65 (quoting <u>United States v. Cronic</u>, 466 U.S. 648, 659 n. 26, 104 S. Ct. 2039, 80 L .Ed. 2d 657 (1984)).

In light of <u>Cronic</u> and the absence of Supreme Court precedent applying the cumulative error doctrine to claims of ineffective assistance of counsel, the state court's rejection of Petitioner's claim is not contrary to or an unreasonable application of clearly established federal law.  *See* <u>Wright v. Van Patten</u>, 552 U.S. 120, 126, 128 S. Ct. 743, 169 L. Ed. 2d 583 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established federal law."); <u>Schriro v. Landrigan</u>, 550 U.S. 465, 478, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007) (The Arizona Supreme Court did not unreasonably apply federal law because "we have never addressed a situation like this."); <u>Reese v. Sec'y, Fla. Dep't of Corr.</u>, 675 F.3d 1277, 1287–88 (11th Cir. 2012) ("The Supreme Court has reiterated, time and again, that, in the absence of a clear answer—that is, a holding by the Supreme Court—about an issue of federal law, we cannot say that a decision of a state court about that unsettled issue was an unreasonable application of clearly established federal law."); *see also* <u>Morris v. Sec'y, Dep't of Corr.</u>, 677 F.3d 1117, 1132 (11th Cir. 2012) (refusing to decide whether, under the current state of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA can ever succeed in showing that the state court's decision on the merits was contrary to or an unreasonable application of clearly established law).  Therefore, Petitioner is not entitled to federal habeas relief on Ground one, sub-claim (4).

E.    <u>Ground Two, sub-claim (1):  "Postconviction counsel failed to raise the claim that trial counsel was ineffective for failing to object to medical examiner's testimony regarding the position decedent was in when he was shot."</u>

Petitioner asserts that his trial counsel was ineffective for failing to object to Dr. Minyard's testimony regarding her theory as to the position of Mr. Russell's body when he was shot (doc. 1 at 33–38).  He alleges trial counsel filed a pre-trial motion in limine to exclude such testimony, on

the ground that Dr. Minyard did not have the expertise to make a scientific conclusion as to the position of the body, but counsel failed to obtain a ruling on the motion (*id.*).  He alleges as a result, Dr. Minyard testified as follows:

> This would be consistent with the decedent lying down or reclining with his knee bent and his left heel on the ground.  Sort of like you would do if you were lying down on the ground looking up at the sky, you would bend your keens and the bottom of your feet would be on the ground.  That's how this looked to me.  It looked like it went from the top of the chest downward into his thigh.

Petitioner alleges there was no basis for Dr. Minyard's testimony, because she did not personally visit the crime scene or conduct any investigation that formed a basis for her opinion (*id.*). Petitioner alleges this testimony caused the jury to reject his defense of self-defense (*id.*).

Petitioner states he presented this IATC claim to the state courts in his initial Rule 3.850 motion, but the court struck the motion as facially insufficient (doc. 1 at 36).  He alleges he retained collateral counsel to file an amended Rule 3.850 motion, but counsel omitted the claim from the amended motion (*id.*).  Petitioner alleges he inquired of collateral counsel the reason for omitting the claim, but counsel failed to respond (*id.*).  Petitioner concedes the IATC claim was not presented to the state courts, but contends the procedural default was caused by ineffective assistance of collateral counsel; therefore, he is entitled to federal review of his IATC claim under Martinez v. Ryan, 132 S. Ct. 1309 (2012) (doc. 1 at 33, 37; doc. 26 at 6–7).

Respondent contends that Petitioner's IATC claim is insubstantial; therefore, he failed to establish "cause" for his procedural default under Martinez (doc. 20 at 56–64).  Accordingly, he is not entitled to federal review of his claim.

As previously discussed, a federal court may consider the merits of a procedurally defaulted claim if the petitioner can show both "cause" for the default and "prejudice" from a violation of his constitutional right.  Wainwright v. Sykes, 433 U.S. 72, 84–85, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977).  To establish cause, a petitioner must ordinarily "demonstrate 'some objective factor external to the defense' that impeded his effort to raise the claim properly in state court."  Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010) (quoting Murray, 477 U.S. at  488).  Before its 2012 decision in Martinez, the Supreme Court had long held that § 2254 petitioners cannot rely on errors made by

their state collateral counsel to establish cause.  *See* Coleman, 501 U.S. at 752–53.  Martinez created a limited, equitable exception to Coleman where, (1) "a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding," as opposed to on direct appeal; (2) "appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of Strickland"; and (3) "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one."  Martinez, 132 S. Ct. at 1318–19 (citations omitted).  Accordingly, the petitioner must "establish that his collateral counsel's conduct 'fell below an objective standard of reasonableness,' and that, 'but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  Hittson v. GDCP Warden, 759 F.3d 1210, 1262 (11th Cir. 2014) (quoting Strickland, 466 U.S. at 688).

In Hittson, the Eleventh Circuit explained:

> [T]he merits of the underlying claim is only a part of the Strickland analysis. With unlimited time and the benefit of hindsight, a petitioner can come up with any number of potentially meritorious ineffective-assistance claims that he now wishes his collateral counsel had raised.  However, a petitioner does not establish constitutionally defective performance simply by showing that (a) potentially meritorious claims existed and (b) his collateral counsel failed to raise those claims. Murray, 477 U.S. at 486, 106 S. Ct. at 2644 ("[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.").  "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Jones v. Barnes, 463 U.S. 745, 751–52, 103 S. Ct. 3308, 3313, 77 L. Ed. 2d 987 (1983).  "[A] per se rule that . . . the professional advocate, [is not] allowed to decide what issues are to be pressed . . . seriously undermines the ability of counsel to present the client's case in accord with counsel's professional evaluation." *Id.* at 751, 103 S. Ct. at 3313.
>
> As we have explained, Strickland instructs courts to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"—that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  466 U.S. at 689–90, 104 S. Ct. at 2065–66.  To overcome this presumption, a petitioner must "establish that no competent counsel would have taken the action that his counsel did take." Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc).

> Thus, to show that his habeas counsel failed to provide the level of representation required by <u>Strickland</u>, [the petitioner] must show more than the mere fact they failed to raise potentially meritorious claims; he must show that no competent counsel, in the exercise of reasonable professional judgment, would have omitted those claims.

<u>Hittson</u>, 759 F.3d at 1263 (footnote omitted).

The Eleventh Circuit then explained <u>Martinez</u>'s "substantial claim" requirement:

> > <u>Martinez</u> articulated the "substantial claim" requirement as follows:
> >
> > To overcome the default, a prisoner must . . . demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.  *Cf.* <u>Miller–El v. Cockrell</u>, 537 U.S. 322, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (describing standards for certificates of appealability to issue).

<u>Martinez</u>, — U.S. at —, 132 S. Ct. at 1318–19.  Neither <u>Martinez</u> nor <u>Trevino</u> [v. <u>Thaler</u>, — U.S. —, 133 S. Ct. 1911, 185 L. Ed. 2d 1044 (2013)] elaborated on or applied this standard, but we take the Court's reference to <u>Miller–El</u> to mean that it intended that lower courts apply the already-developed standard for issuing a COA, which requires "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

> As the Court explained in <u>Miller–El</u>, "[a] petitioner satisfies this standard by demonstrating . . . that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  537 U.S. at 327, 123 S. Ct. at 1034.  Where a petitioner must make a "substantial showing" without the benefit of a merits determination by an earlier court, he must demonstrate that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604, 146 L. Ed. 2d 542 (2000).  That does not mean that a petitioner must show "that some jurists would grant the petition."  <u>Miller–El</u>, 537 U.S. at 338, 123 S. Ct. at 1040.  "[A] claim can be debatable even though every jurist of reason might agree, after the . . . case has received full consideration, that petitioner will not prevail."  *Id.*

> We observe that this standard is similar to the preliminary review conducted by district judges in § 2254 proceedings.  Rule 4 of the § 2254 Rules allows the district judge to summarily dismiss a petition "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief."  The Advisory Committee Notes further instruct that, in keeping with the heightened, fact-pleading

requirement in habeas cases, "the petition is expected to state facts that point to a real possibility of constitutional error."  Advisory Committee Note to Rule 4 of the Rules Governing Section 2254 Cases (quotation marks omitted).

Thus, we examine the allegations in . . . the § 2254 petition to see whether "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right."  In making this determination, we consider the fact-pleading requirement for § 2254 petitions, and the standard from Strickland.

Hittson, 759 F.3d at 1269–70 (footnotes omitted).

The court will thus analyze whether Petitioner's IATC claim, that counsel was ineffective for failing to object to the medical examiner's testimony regarding the position of the victim when he was shot, is substantial.  The testimony of Dr. Minyard cited by Petitioner constitutes the whole of her opinion regarding the position of the victim's body when shot:

This would be consistent with the decedent lying down or reclining with his knee bent and his left heel on the ground.  Sort of like you would do if you were lying down on the ground looking up at the sky, you would bend your keens and the bottom of your feet would be on the ground.  That's how this looked to me.  It looked like it went from the top fo the chest downward into his thigh.

(Ex. J at 311).  On cross-examination, utilizing her pre-trial deposition, Petitioner's trial counsel extensively questioned Dr. Minyard regarding her professional ability to draw a conclusion about the position of Mr. Russell's body when he was shot, effectively establishing that it was theoretical and a matter outside her expertise (see Ex. J at 328–31).  Further, prior to trial, defense counsel obtained physical evidence from the crime scene for independent testing, including Mr. Russell's clothing, the bedroom door, and both shotguns (see Ex. F).  In the defense case-in-chief, defense counsel presented extensive testimony from two expert witnesses, Janice Johnson, an expert in crime scene and shooting reconstruction, and Dr. Michael Berkland, a forensic pathologist, as well as physical evidence in support of their testimony (Ex. J at 356–403, 536–606). Through their combined testimony regarding their experiments and examination of the physical evidence and the crime scene, defense counsel established that the victim was not on his back when he was shot; rather, the victim was closer to the closet when he was first shot in the chest, hitting his right wrist in the process, and then he was shot in the head through the bedroom door as he made some attempt

to close the door as he went to the floor (Ex. J at 356–403, 536–606; Ex. L).  This expert testimony and evidence was so convincing that the prosecutor conceded it in rebuttal closing:

> His whole case and both of the experts, Jan Johnson and Dr. Berkland, gave their lengthy presentation.  It was all about where Mr. Russell was shot.  It was all about where Mr. Russell was shot.  I don't care.  That's why we didn't try to refute that, because I agree with it.  I agree with everything they said about where he was when he was shot.  The issue is why he was shot?  That's the issue.

(Ex. J at 732).

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  Strickland, 466 U.S. at 690–91.  Here, defense counsel was obviously aware of Dr. Minyard's potential testimony regarding the position of Mr. Russell's body, as evidenced by his pre-trial motion in limine (Ex. E).  Defense counsel chose to attack the basis of her opinion through cross-examination and the presentation of testimony and evidence from expert witnesses in the defense case.  Having conducted a thorough investigation, counsel's action was, at a minimum, reasonable.  See id.; Rogers, 13 F.3d at 386 ("Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so.").  Indeed, defense counsel's choice reflects a sound and reasoned trial strategy, given that the testimony of the defense experts may have cast doubt on other aspects of Dr. Minyard's testimony that were unfavorable to Petitioner.

Petitioner's underlying IATC claim is not substantial.  Therefore, he failed to show cause for his procedural default of the claim.  Accordingly, he is not entitled to federal review of Ground Two, sub-claim (1).

> F.      Ground Two, sub-claim (2):  "Postconviction counsel failed to raise the claim that trial counsel was ineffective for failing to object to trial court's issuing conflicting jury instructions."

Petitioner alleges his theory of self-defense was predicated on Florida's "stand your ground" law, Florida Statutes § 776.012 (doc. 1 at 38–42). He alleges the jury instructions on self-defense and "stand your ground" were confusing, because the "stand your ground" instruction stated that he had no duty to retreat, but that instruction was negated by the instruction that stated he had to exhaust every reasonable means of escaping danger (*id.* at 39–41). Petitioner contends the conflicting instructions negated any possible application of his theory of self-defense (*id.*). He claims that his trial counsel was ineffective for failing to object to the confusing jury instructions (*id.*). He contends the jury's verdict would have been different if they had not received the confusing jury instructions (*id.*). He also contends he was prejudiced by counsel's failure to object, because the issue was not preserved for direct appeal (*id.*). Petitioner concedes that this IATC claim was not presented in his amended Rule 3.850 motion (*id.* at 41). He alleges that after the First DCA affirmed the lower court's decision denying his amended Rule 3.850 motion, his collateral counsel telephoned him and "informed Petitioner that the jury instructions utilized at trial were fundamentally flawed and that he should have raised this issue concerning the 'stand your ground' instructions in Petitioner's amended motion for postconviction relief. He [counsel] stated that he overlooked this issue when preparing Petitioner's motion" (doc. 1 at 41). Petitioner contends his collateral counsel's ineffectiveness constitutes "cause" for the procedural default of his IAC claim, pursuant to Martinez (doc. 1 at 42; doc. 26 at 12–14).

Petitioner additionally appears to claim that he received ineffective assistance of appellate counsel ("IAAC"), based upon appellate counsel's failure to raise the jury instruction issue on direct appeal (*see* doc. 26 at 9–12). He contends his collateral counsel should have presented the IAAC claim in the Rule 3.850 proceeding, but he failed to do so (*id.* at 19). Petitioner argues that the "cause" exception announced in Martinez should apply to his IAAC claim (*id.* at 15–19).

Respondent contends that Petitioner's IATC claim is insubstantial; therefore, he failed to establish "cause" for his procedural default under Martinez (doc. 20 at 67). Accordingly, he is not entitled to federal review of his IATC claim. Respondent contends that if Petitioner intends to assert an IAAC claim as an independent basis for federal habeas, the claim is unexhausted and procedurally defaulted (*id.* at 68–70). Respondent contends that to properly exhaust an IAAC claim,

Petitioner must present it in a state habeas petition, which must be filed within two years of issuance of the mandate on Petitioner's direct appeal (*id.*).  Respondent argues that Petitioner has not filed a state habeas petition alleging this IAAC claim, and the deadline for his doing so has passed; therefore, he is not entitled to federal review of his IAAC claim (*id.*).

The jury instructions upon which Petitioner's IATC claim is based are the following:

An issue in this case is whether the defendant acted in self-defense.  It is a defense to the offense with which Kaulman Reese Vines is charged if the death of Ross Russell resulted from the justifiable use of deadly force.  Deadly force means force likely to cause death or great bodily harm.  The use of deadly force is justifiable only if the defendant reasonably believes that the force is necessary to prevent imminent death or great bodily harm to himself.  A person is justified in using deadly force if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another.  However, the use of deadly force is not justifiable if you find Kaulman Reese Vines initially provoked the use of force against himself unless, A, the force asserted toward the defendant was so great that he reasonably believed that he was in emit—excuse me, imminent danger of death or great bodily harm and had exhausted every reasonable means to escape the danger other than using deadly force on Ross Russell, or, B, in good faith, the defendant withdrew from physical contact with Ross Russell and clearly indicated to Ross Russell that he wanted to withdraw and stop the use of deadly force, but Ross Russell continued or resumed the use of force.

In deciding whether the defendant was justified in the use of deadly force, you must judge him by the circumstances by which he was surrounded at the time the force was used.  The danger facing the defendant need not have been actual.  However, to justify the use of deadly force, the appearance of danger must have been so real that a reasonably cautious and prudent person under the same circumstances would have believed that the danger could be avoided only through the use of that force.  Based upon appearances, the defendant must have actually believed that the danger was real.  If the defendant was not engaged in an unlawful activity and was attacked in any place where he had a right to be, he had no duty to retreat and had the right to stand his ground and meet force with force, including deadly force, if he reasonably believed that it was necessary to do so to prevent death or great bodily harm to himself.

If you find that the defendant who, because of threats or prior difficulties with Ross Russell, had reasonable grounds to believe that he was in danger of death or great bodily harm at the hand of Ross Russell, then the defendant had the right to arm himself.  However, the defendant cannot justify the use of deadly force if after

arming himself, he renewed his difficulty with Ross Russell when he could have avoided the difficulty.  Although as previously explained, if the defendant was not engaged in an unlawful activity and was attacked in any place where he had a right to be, he had no duty to retreat.

(Ex. J at 746–48).

The trial transcript shows that during the charge conference, Petitioner's trial counsel made the very objection to the jury instruction that Petitioner faults counsel for not making (*see* Ex. J at 526–32).  The trial court overruled the objection (*id.* at 530–32).  Additionally, trial counsel renewed his objection at the close of the evidence, prior to closing arguments and the court's instructing the jury (*id.* at 673).  Petitioner failed to show that his IATC claim, based upon trial court's alleged failure to object to the "stand your ground" and self-defense instructions as confusing, is substantial.  Therefore, he failed to show cause for his procedural default of the IATC claim.

With regard to Petitioner's IAAC claim, the court agrees with Respondent's position that the claim is procedurally defaulted.  In Florida, a claim of IAAC is actionable in a petition for writ of habeas corpus filed in the appellate court to which the appeal was taken.  *See* Fla. R.App. P. 9.141(d).  Petitioner filed two state habeas petitions alleging IAAC in the First DCA (Exs. HH, KK).[12]  Petitioner did not argue in either of his state habeas petitions that appellate counsel was ineffective for failing to raise an issue concerning the jury instructions (*id.*).  Because Petitioner did not exhaust an independent claim of IAAC with regard to appellate counsel's failure to present the jury instruction issue on direct appeal, that claim cannot serve as cause to excuse his procedural default of the claim.

Further, Petitioner has not demonstrated he is entitled to federal review of his IAAC claim pursuant to Martinez.  "By its own emphatic terms, the Supreme Court's decision in Martinez is

---

[12] In Petitioner's first state habeas petition, he argued that appellate counsel failed to notify him of the result of his direct appeal, thus denying him the opportunity to seek further review in a higher court (Ex. HH).  He additionally argued that appellate counsel should have presented the following issue on direct appeal:  trial counsel was ineffective for failing to play a recording of Petitioner's 911 call at trial, which would have shown that Deputy Ruppert responded to Petitioner's call on August 31, 2007, not September 1, 2007 as Deputy Ruppert testified (*id.*).  In Petitioner's second petition, he re-asserted his argument that appellate counsel failed to notify him of the result of his direct appeal, thus denying him the opportunity to seek further review in a higher court (Ex. KK).  He additionally argued that appellate counsel erred by asserting IATC claims on direct appeal (*id.*).

limited to claims of ineffective assistance of <u>trial</u> counsel that are otherwise procedurally barred due to the ineffective assistance of post-conviction counsel." <u>Gore v. Crews</u>, 720 F.3d 811, 816 (11th Cir. 2013) (emphasis added). Therefore, Petitioner cannot rely upon <u>Martinez</u> to excuse the procedural default of his IAAC claim.

       G.    <u>Ground Two, sub-claim (3): "Cumulative Errors."</u>

Petitioner re-asserts a claim that the cumulative effect of all of the errors of trial counsel asserted in his § 2254 petition deprived him of a fair trial as guaranteed by the Sixth and Fourteenth Amendments (doc. 1 at 42–43).

Respondent contends Petitioner did not exhaust this claim, and it is now procedurally barred (doc. 20 at 71–72). Respondent further contends that Petitioner cannot show cause for the procedural default, because his "cumulative error" claim is insubstantial (*id.* at 72). Respondent contends Petitioner cannot establish that his trial counsel was constitutionally ineffective under any single ground; therefore, he cannot demonstrate entitlement to relief on a claim of cumulative error (*id.*).

Petitioner did not present to the state courts the "cumulative error" claim he presents here, that is, that the alleged errors of trial counsel asserted herein, including the unexhausted errors, had the cumulative effect of denying him of a fair trial. Further, he cannot satisfy the "cause and prejudice" exception to the procedural bar, because his "cumulative error" claim is not substantial. Although the Eleventh Circuit has noted, on direct appeal of a federal conviction, that the cumulative effect of several errors that are harmless by themselves could so prejudice the defendant's right to a fair trial that a new trial may be necessary,[13] the Eleventh Circuit has never expressly recognized a freestanding "cumulative effect" claim, based upon the assertion that alleged errors of the trial

---

[13] *See* <u>United States v. Baker</u>, 432 F.3d 1189, 1223 (11th Cir. 2005) ("The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal.") (internal quotations and citations omitted); <u>United States v. Ramirez</u>, 426 F.3d 1344, 1353 (11th Cir. 2005) ("[T]he 'cumulative effect' of multiple errors may so prejudice a defendant's right to a fair trial that a new trial is required, even if the errors considered individually are non-reversible.") (quoting <u>United States v. Thomas</u>, 62 F.3d 1332, 1343 (11th Cir.1995)), <u>United States v. Adams</u>, 74 F.3d 1093, 1099–1100 (11th Cir. 1996) (citing <u>United States v. Preciado-Cordobas</u>, 981 F.2d 1206, 1215 n.8 (11th Cir. 1993)).

court, defense counsel, or the State, or a combination thereof, rendered the trial fundamentally unfair even though such errors were individually harmless or non-prejudicial, as cognizable under § 2254. *See, e.g.,* Conklin v. Schofield, 366 F.3d 1191, 1210 (11th Cir. 2004) (applying pre-AEDPA standard of review and denying claim that trial court errors and conduct of trial counsel combined to rob petitioner of fair trial and sentencing, but not relying upon Supreme Court precedent for its decision); Sims v. Singletary, 155 F.3d 1297 (11th Cir. 1998) (applying pre-AEDPA standard of review and holding that district court erred in finding that cumulative guilt stage errors prejudiced petitioner during penalty phase); Cargill v. Turpin, 120 F.3d 1366, 1386 (11th Cir. 1997) (applying pre-AEDPA standard of review and declining petitioner's invitation to entertain "cumulative error" claim because petitioner's trial was not fundamentally unfair); Dobbs v. Kemp, 790 F.2d 1400, 1505 (11th Cir. 1986) (applying pre-AEDPA standard of review and denying petitioner's claim that improper prosecutorial argument and evidentiary errors rendered trial fundamentally unfair and citing Donnelly v. DeChristoforo, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1973)); Bronstein v. Wainwright, 646 F.2d 1048, 1056 (5th Cir. 1981) (same).

In any event, cumulative error analysis should evaluate only matters determined to be in error, not the cumulative effect of non-errors. *See* United States v. Waldon, 363 F.3d 1103, 1110 (11th Cir. 2004) (where no individual errors have been demonstrated, no cumulative errors can exist). As previously discussed, Petitioner has not shown error of a constitutional dimension with respect to any of the alleged errors of trial counsel. Therefore, he is not entitled to federal habeas relief on this "cumulative error" claim.

VI.     CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L.

Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (doc. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 2nd day of October 2015.

/s/ Elizabeth M. Timothy
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**